IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | | |
|---|---|---|
| PAMELA M.,[1] | ) | |
| Plaintiff, | ) | Civil Action No. 5:20-cv-00043 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| KILOLO KIJAKAZI, | ) | By:   Joel C. Hoppe |
| Acting Commissioner of Social Security, | ) | United States Magistrate Judge |
| Defendant.[2] | ) | |

Plaintiff Pamela M. asks this Court to review the Commissioner of Social Security's final

decision denying her application for disability insurance benefits ("DIB") under Title II of the

Social Security Act (the "Act"), 42 U.S.C. §§ 401–434. The case is before me by referral under

28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the parties' filings, oral

arguments, and the applicable law, I find that the Commissioner's decision is supported by

substantial evidence. Accordingly, I respectfully recommend that the presiding District Judge

affirm the decision.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v.

Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not

"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for

that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court

reviewing the merits of the Commissioner's final decision asks only whether the Administrative

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the
United States has recommended that, due to significant privacy concerns in social security cases, federal
courts should refer to claimants only by their first names and last initials.

[2] Acting Commissioner Kijakazi is hereby substituted for the former Commissioner, Andrew M. Saul, as
the named defendant in this action. *See* 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 20 C.F.R. § 404.1505(a).[3] Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets

---

[3] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant

work based on his or her residual functional capacity; and, if not (5) whether he or she can

perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*,

858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of

proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to

prove that the claimant is not disabled. *See id.*

## II. Procedural History

Pamela applied for DIB in January 2018. Administrative Record ("R.") 194–99, ECF No.

11. She alleged disability as of June 14, 2017, based on the following impairments: mild to

moderate cervical stenosis; degenerative changes below fusion at C6-7; hand tingling and

numbness; back pain and disc problems; trouble sleeping; anxiety; body jerks, twitches, and leg

weakness; Lyme disease; nerve problems; and vertigo. R. 75–76, 213. Pamela was thirty-eight

years old, or a "younger person" under the regulations, on her alleged onset date. R. 75; *see* 20

C.F.R. § 404.1563(e). Disability Determination Services ("DDS"), the state agency, denied her

claim initially in July 2018, R. 73–87, and upon reconsideration that October, R. 88–104. In

August 2019, Pamela appeared with counsel and testified at an administrative hearing before

ALJ Brian B. Rippel. *See* R. 37–72. A vocational expert ("VE") also testified at this hearing. *See*

R. 46–69.

ALJ Rippel issued an unfavorable decision on September 3, 2019. *See* R. 15–29. He

found that Pamela had not engaged in substantial gainful activity since June 14, 2017, her

alleged onset date. R. 17. Pamela had the following "severe" impairments during the relevant

period: degenerative disc disease of the lumbar spine, degenerative disc disease of the cervical

spine status-post fusion, arthritis, neuropathy, vertigo, migraine headaches, cervicalgia,

trigeminal neuralgia, lumbar radiculitis, and facet joint osteoarthritis/arthropathy. *Id.* He found

her other medically determinable impairments ("MDI") were "non-severe." *Id.* With respect to epilepsy, ALJ Rippel explained that Pamela "was assessed with generalized convulsive epilepsy and myoclonic epilepsy in January 2019," but the convulsive epilepsy "diagnosis was changed to temporal lobe epilepsy . . . in February 2019" and her "epilepsy was noted to be improved" in May 2019 after a nerve-block injection and starting new medication. R. 18. ALJ Rippel found that Pamela's epilepsy was a non-severe MDI during the relevant period because it had "been responsive to medication, ha[d] not required significant medical treatment, and ha[d] not resulted in any continuous exertional or non-exertional functional limitations" for twelve continuous months. *Id.*; *see* R. 28 (rejecting allegation that Pamela "had convulsive episodes several times a week during the []day and needed time to recover afterwards" because it "lacks support [from] objective medical evidence [in the] record," the convulsive epilepsy diagnosis was changed to temporal lobe epilepsy with myoclonic epilepsy in February 2019, and her epilepsy "was noted to be improved" in May 2019 after she started a new prescription medication). None of Pamela's severe impairments met or equaled a relevant Listing. R. 19–21 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 1.02, 1.04. 2.07, 11.14).

ALJ Rippel then evaluated Pamela's residual functional capacity ("RFC") and found that she could do "light"[4] work, except she could only occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl; could never climb ladders, ropes, or scaffolds; could occasionally reach overhead with her bilateral upper extremities; and could tolerate occasional

---

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). A person who can meet these relatively modest lifting requirements can perform "[t]he full range of light work" only if he or she can also "stand or walk for up to six hours per workday or sit 'most of the time with some pushing and pulling of arm or leg controls.'" *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010) (quoting 20 C.F.R. § 404.1567(b)); SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983); *see* R. 21 (finding that Pamela could lift and/or carry "up to 20 pounds occasionally and 10 pounds frequently" and "stand[] and/or walk[] up to 6 hours and sit[] up to 6 hours in an 8-hour workday").

exposure to vibration and no exposure to workplace hazards. R. 21. Based on this RFC finding

and the VE's testimony, ALJ Rippel found that Pamela was unable to perform her past relevant

work, but that she could perform certain unskilled "light" jobs existing in significant numbers in

the national economy, including usher/lobby attendant, counter clerk, and children's attendant.

R. 26–28 (citing R. 61–66). Thus, ALJ Rippel concluded that Pamela was not disabled from June

14, 2017, through September 3, 2019. R. 28. The Appeals Council declined review, R. 1–6, and

this appeal followed.

III.    Discussion

Pamela challenges the weight the ALJ assigned to certain evidence in the record. *See*

*generally* Pl.'s Br., ECF No. 13. Specifically, Pamela contends the ALJ erred by failing to give

"considerable weight" to the opinion of her treating physician, Roland Lee, M.D. Pl.'s Br. 1–2.

She further contends that the ALJ "failed to give appropriate weight to the medications [Pamela]

takes on a daily basis," noting she testified that their side effects "would limit her ability to be

gainfully employed." *Id.* at 2. Lastly, Pamela argues that because the "Social Security

Administration failed to have [her] evaluated in person by their own physician, . . . the [ALJ]

should have given appropriate weight to the treatment records of Sentara RMH Neurology." *Id.*

Her arguments are not persuasive.

*A.    Summary*

*1.    Relevant Medical Evidence*

In October 2017, Pamela presented to the emergency department at Sentara Rockingham

Memorial Hospital with intermittent left facial pain she had experienced for six months and ear

pain. R. 294–95. She "ha[d] some chronic aspects to it but she also [got] superimposed severe

pain which [was] intermittent." R. 295. She said she experienced "jerking of her muscles when

5

she [was] resting at night but [it did] not happen during the day." *Id.* Examination findings and

labs were normal. R. 296. Christina Johnson, M.D., "fe[lt] her symptoms [were] most consistent

with trigeminal neuralgia," started her on carbamazepine (Tegretol), and instructed her to follow

up with neurology. *Id.* In November, Pamela saw neurologist Nando Visvalingam, M.D.,

complaining of facial pain; malaise/fatigue; back pain; muscle weakness, pain, and cramps;

headaches; numbness/tingling; tremors; and anxiety and depression. R. 299. *But see* R. 300

("Currently her pain is in remission."). Examination revealed no sensory deficits, normal gait and

station, normal muscle tone, normal strength throughout except for "mild weakness of her right

hand at 4+/5," and postural tremor in both hands. R. 304. Dr. Visvalingam noted a history of

cervical fusion at C5-6, and he diagnosed trigeminal neuralgia of the left side of the face, neck

pain, essential hypertension, urinary frequency, and "jerky body movements." R. 300. He also

"[r]ecommended that she reduce her chronic narcotic regimen," noting she was "taking

methadone 10 mg 4 [times] a day," which "may be contributing to generalized myoclonus." *Id.*

A cervical spine MRI demonstrated "[p]rogression of degenerative changes" compared to images

taken in April 2008, "including at the level just below the fixation at the C6-C7 with up to mild

to moderate central canal stenosis." R. 366. There was "no malalignment or high-grade central

canal or neuroforaminal stenosis status post ACDF at the C5-C6 level." *Id.* An MRI of Pamela's

head and face showed "[n]o significant . . . abnormality of the trigeminal nerves." R. 365 (Dec.

2017).

    In January 2018, Pamela presented to Valley Health; she complained of ear pressure and

pain, reported hearing a "whooshing" sound in her left ear, said she had been experiencing

vertigo, and "report[ed] that she has had these symptoms for the past year." R. 320. Pamela

underwent audiology testing that day which showed hearing within normal limits. R. 320–21.

She also had a neurological follow up with Dr. Visvalingam who noted her brain MRI "did not show any evidence of multiple sclerosis." R. 306. Pamela said that she was "taking [600 mg] gabapentin primarily in the evening for sleep" and it was "helping her symptoms." *Id.* She also had "cut back to 10 mg daily" of methadone, which "in the past was thought to be causing myoclonus." *Id.* Examination revealed normal gait, abnormal reflex, no tremor, and normal muscle tone and coordination. R. 308. Dr. Visvalingam diagnosed cervical stenosis of the spinal canal, trigeminal neuralgia of the left side of the face, cervicalgia, and paresthesia, and he "[r]ecommend[ed] increasing gabapentin to help with paresthesias and cervicalgia." R. 305.

Around the same time, Pamela visited the Hess Orthopedic Center Clinic complaining of chronic lower back pain ("LBP") since 2005. R. 586, 589. She rated her pain a six-out-of-ten, and she said it was constant and radiated to her left thigh. R. 589. She denied fatigue, dizziness, headaches, paresthesias, and weakness. R. 586. Examination revealed soft tissue and a bony appearance with gentle lumbar lordotic curve, no gross edema, midline lumbar pain, a "brisk femoral pulse with 2/4 patellar and Achilles deep tendon reflexes and intact superficial reflexes"; full but painful active range of motion on the left with flexion, lateral bending, rotation; "4 + left iliopsoas"; and negative leg roll and positive Faber test on the left. R. 587–88, 590. Pamela Thomas, P.A., assessed low back pain, lumbosacral radiculitis, and degeneration of lumbar disc, and recommended rest, ice, activity modification, and gentle range of motion ("ROM") exercises. R. 590–91A lumbar MRI done that month showed "[c]ongenital variation of the posterior elements of L5 with incomplete fusion of the posterior arch including at the left lamina" that "appear[ed] to result in some arthropathy on the left at L4-5 and on the right at L5-S1." R. 363.

In late January, Pamela complained to PA Thomas of neck pain. R. 583. Her pain was constant and radiated to her shoulders and arms, and she had numbness and tingling of the hands and "intermittent twitching on both sides of her face at times." *Id.* Neck stiffness, crepitus, headaches, spasms, and left-hand weakness were listed as associated problems. *Id.* Examination showed "pain elicited over the cervical C4-C5 spinous interspace and bilateral trapezius"; 2/4 strength in her biceps, brachioradialis, and triceps; 5/5 strength of the intrinsic muscles of the cervical spine; and painful and limited ROM in all planes. R. 584. PA Thomas assessed cervicalgia, cervical spondylosis, and cervical radiculitis. R. 584–85. She ordered a refill of Pamela's clycobenzaprine (for muscle spasms) and referred her to physical therapy. R. 585. Pamela did physical therapy from February to March. *See* R. 545–78. During her initial visit, she reported lower back pain that limited her ability to stand for more than 10 or 15 minutes, neck stiffness with "moderate limitation turning [her] head while driving," and headaches that interfered with sleeping, but she denied "significant lifting overhead," "object drop/grip loss," and "significant limitation sitting[.]" R. 545. She was discharged from PT in April for failure to return after having partially met her goals. R. 578; *see, e.g.*, R. 567 ("Reports some improvement in pain and spasms since last visit. . . . Good initial response to PT noting improved sleep and reduction in muscle pain < 5/10 at worst."); R. 569 ("[M]uch improved overall cervical pain and headaches, however some regression following recent [respiratory] illness noting pain at worst 5/10."); R. 573–74 ("Great response to PT overall but progress often inconsistent pending patient compliance with PT visits/recent illness. Goals partially met."). Pamela saw PA Thomas again in April. R. 580. PA Thomas's exam findings were unchanged from January. R. 582. Pamela "report[ed] no real improvement in her LBP," and she reported increased cervical pain. *Id.* It was

noted that Pamela would try ice and a TENS unit "for now" and PA Thomas added facet injections to the recommended treatment. *Id.*

In May, Pamela saw Tabitha Garrison, FNP, complaining of back, neck, joint, and muscle pain; dizziness; blurry vision; chest pain; and wheezing. R. 684. Examination demonstrated 4+/5 motor strength; positive straight leg raising test; positive facet loading in the lumbar, cervical, and thoracic spines; tenderness to palpation in the left sacroiliac joint; tenderness and limited ROM; antalgic gait; diminished sensation to light touch in her left upper and lower extremities; and pain with motion in her neck. *Id.* FNP Garrison recommended an epidural steroid injection, noting that Pamela had "failed conservative therapies" for neck pain, R. 685; *see also* R. 684 ("Physical therapy worsened pain"), and she added prescriptions for Voltaren gel, Cymbalta, Mobic, Baclofen, and Ropinirole to Pamela's then-existing 300 mg Gabapentin daily, *see* R. 677, 682, 686. In June, Pamela requested new treatment modalities for her low back and neck pain and FNP Garrison "recommended a lumbar spine orthotic brace to provide support and stabilization." R. 677. After this visit, FNP Garrison noted that Pamela's urine screen from May 2018 was "inconsistent" with her medication regimen because it showed methadone. R. 691. FNP Garrison noted that Pamela had not disclosed that she attended a methadone clinic three times a week and said that such "[n]ondisclosure means that she knowingly provided false information in order to receive pain medications." *Id.* Citing the concern that Pamela was "at high risk for medication misuse, abuse, drug diversion and illicit drug use," she was "discharged from the practice." *Id.*

In August, Pamela presented to Dr. Lee's clinic at Page Memorial Hospital for a routine follow up and labs check. R. 742. She "voice[d] no acute complaints," *id.*, but her review of systems was positive for dizziness and headaches, R. 743. Stacey Cash, MA, noted no

9

remarkable examination findings, assessed vertigo and non-intractable headache, *id.*, and noted

that Pamela "continue[d] to see UVA pain management, and neurology with Dr. Visvalingam for

her chronic complaints." R. 744. In December, a brain MRI revealed "[a]t least five right, and

ten left, small, nonspecific, T2 hyperintensities in the subcortical and deep white matter of both

cerebral hemispheres," but "[n]o acute intercranial findings" and the MRI was "otherwise

normal." R. 938.

Pamela visited Glenn Deputy, M.D., for a comprehensive neurological evaluation in

January 2019. R. 893–98. Pamela wanted to try something other than "gabapentin for headaches

and dizziness," which she said had "clearly worsened over the past 2 years." R. 894. She had

daily headaches and said that "[w]hen she sits up she gets vertigo and vomits." *Id.* Pamela also

reported that during these headaches she "would experience a brain sap [sic] and then will feel

confused." *Id.* (also noting Pamela's report that she "had at least 6 episodes of déjà vu" in the

past year). Dr. Deputy noted that Pamela's brain MRI revealed changes consistent with "chronic

headache." *id.* ("Certainly a patient with chronic headache can have white matter lesions."), that

her symptoms were "suggestive of benign positional vertigo," and that the "myoclonus and brain

zaps could be indicative of a localization related epilepsy or a myoclonic epilepsy," R. 893.

Examination revealed "marked limitation" of ROM in her cervical spine, "tenderness over the

occipital and supraorbital nerves," "[s]ome essential tremor," "markedly hyperactive reflexes,"

and intact gait and station without evidence of "cranial nerve palsy" or "parkinsonian features."

R. 896. Dr. Deputy assessed B12 deficiency, vertigo, convulsive epilepsy, chronic migraine,

supraorbital neuralgia, bilateral occipital neuralgia, myoclonic epilepsy, and cervicalgia. R. 893.

He did "not believe she ha[d] MS," but she "clearly ha[d] chronic pain." R. 893. In February,

Pamela underwent a greater occipital nerve block. R. 909.

Pamela visited Dr. Lee in February, complaining of an off-and-on abdominal pain that had been present for four or five months and back pain symptoms for the past two months. R. 925. Pamela said her abdominal pain "fe[lt] like something [was] pinching" her, was exacerbated by bending, and was "getting worse particularly over the last month." *Id.* She said her back pain was "like an ache" and had a "weird tingling feeling like something is crawling up it." *Id.* Examination revealed tenderness in her abdomen, positive Murphy's sign, tenderness throughout the thoracic vertebrae and parathoracic muscles, and normal reflexes and muscle tone. R. 926. Dr. Lee assessed right upper quadrant pain and thoracic back pain and ordered imaging on Pamela's thoracic and lumbar spines and abdomen. *Id.* Imagining on her abdomen demonstrated normal results. R. 927–30.

Pamela saw Dr. Deputy again in April regarding temporal lobe epilepsy. R. 907. Results from recent EEGs showed "dysrhythmia grade 3 left temporal" and "dysrhythmia grade 2" right temporal. *Id.* Dr. Deputy noted Pamela's report that her symptoms were "improving" with the addition of Lamictal, but that she still experienced "brain zaps, eye fluttering, tightness in her jaw, and occasional myoclonic jerks." *Id.*; *see also* R. 908 ("She had a recent episode where she jerked and fell out of bed. She still has some brain zaps. Only rare déjà vu."). On exam, Pamela had "pan positive trigger points," but was "[o]therwise neurologically unchanged." R. 907. Dr. Deputy instructed Pamela to continue with the pain clinic, to increase her Lamictal dosage, and to follow-up in six weeks. *Id.* Her EEG was unchanged at a follow up in May. R. 906. On exam, Dr. Deputy noted tenderness in her lower rib cage area and no neurological changes. *Id.* Dr. Deputy increased her Lamictal dosage and ordered her to follow up in three months. *Id.*

In June, Pamela complained to Thomas Murphy, M.D., of daytime fatigue and sleepiness when following up after a sleep study. R. 913. Dr. Murphy noted that Pamela was "on multiple

medications at th[at] time many of which can cause fatigue," *id.*, and it was "very likely that her complaints of daytime fatigue have multi-facets," including untreated sleep apnea, R. 914 ("We are going to try to fix the sleep apnea to see how much improvement she gets."). Examination showed orientation times three and normal gait and station. R. 914. Dr. Murphy assessed obstructive sleep apnea and restless leg syndrome. *Id.*

Pamela saw Dr. Lee in August 2019 for a checkup and to fill out disability forms. R. 948. Dr. Lee listed temporal lobe epilepsy, myoclonic epilepsy, chronic low back pain with sciatica, chronic cervical pain, anxiety and depression, vertigo, and insomnia as problems that were addressed at her visit. R. 948. Pamela was taking Lipitor, Baclofen, Gabapentin, Mobic, Methadone, Prednisone, and Trazodone at the time. R. 949. Dr. Lee ordered an increase in her Gabapentin dosage. R. 950. Dr. Lee also opined as to Pamela's functional capabilities. *See* R. 943–47. He noted that Pamela suffered from chronic lower back pain, chronic neck pain, and "chronic musculoskeletal abdominal pain." R. 944. He found that Pamela tired easily, and he opined that she could not bend, stoop, or lift; could not sit for long periods; and was "markedly limited" in standing, walking, running, and pulling secondary to pain. R. 945 ("Markedly limited due to pain."). More specifically, Pamela could sit in one position and stand for less than one hour each in an eight-hour workday and that she could frequently lift less than five pounds. *Id.* Her "grip or fine motor [were] not impaired," and she did not have any sensory limitations, *id.*, or treatment-related restrictions, R. 944 ("Please state the side effects or restrictions caused by any treatment or therapy. N/A"). Nonetheless, Dr. Lee concluded that Pamela "cannot engage in any type of gainful activity" and had been unable to do so since "2016." R. 945.

2.    *Pamela's Statements*

Pamela submitted a Function Report to DDS in May 2018. *See* R. 231–39. Her lower back, foot, and neck pain limited her abilities to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and complete tasks. R. 237. Her pain caused difficulty sleeping and shaving. R. 233. She prepared TV dinners and snacks daily for thirty minutes to an hour, but she could not prepare complete meals or stand for prolonged periods. R. 234. She did laundry and washed dishes, but she had to take breaks. *Id.* She shopped for groceries two or three times a week for about thirty minutes to an hour. R. 235. Her hobbies included watching television and crossword puzzles, and she did both daily. R. 236. Her social life was "mostly" limited to seeing her family in person, she would go to the store "sometimes every day," she attended church every Sunday, and she did not like to go anywhere alone. *Id.* Pamela used a back brace during the day. R. 238.

Pamela submitted a second Function Report to DDS in September 2018. *See* R. 251–59. When she experienced vertigo, she would stay in bed all day and night. R. 252. When she was able to get out of bed, her typical daily activities consisted of washing clothes, grocery shopping, and going to doctor's appointments, but only on an "as needed" basis. *Id.* Her neck pain, vertigo, and body jerks and twitches caused trouble sleeping. R. 253. She grocery shopped once or twice a month for about an hour. R. 255. Pamela's only hobbies were reading and watching television. R. 256. She would try to talk with others on the phone at least once a week. *Id.* She went to doctor's appointments and the grocery store on a regular basis and attended church "sometimes." *Id.* Pamela continued to wear a back brace. R. 258. Her vertigo caused nausea, vomiting, and balance issues, and she could not "take much of [her] pain medicine at one time [be]cause [it] makes [the vertigo] worse so [her] pain level is always high all the time." R. 259.

In August 2019, Pamela testified at an administrative hearing before ALJ Rippel. *See* R. 37–72. Her convulsive epilepsy caused brain "shocks," dizziness, nausea, and migraines, R. 49,

she experienced episodes about twelve times a month, R. 49, and it took about four days to

recover, R. 50. She could not predict when those episodes would hit. R. 50. She also had about

three episodes of myoclonic epilepsy every night that interrupted her sleep, R. 50–51, and four or

five episodes of temporal lobe epilepsy every week, R. 49, 51. Each epileptic episode was

accompanied by a seizure in addition to the other symptoms. R. 52. Her epilepsy medication

provided no relief. *Id.* Her vertigo also caused dizziness and balance issues, and her vertigo

medications were likewise ineffective. R. 53. Her back and neck issues made her unable to stand

for long and limited the range of motion in her neck. R. 53. She could not sit more than thirty

minutes without needing to rest or lie down. R. 54. She needed to rest or lay down during the

day. R. 55. She took Baclofen for back pain, and it made her drowsy. R. 56. Meloxicam caused

nausea and vomiting, *id.*, Ropinirole caused drowsiness and nausea, R. 55–56, Gabapentin made

her drowsy and tired, R. 56, Dofcan made her drowsy, *id.*, Azofacan caused dizziness, *id.*,

Mofacan caused headaches, *id.*, Prednisone caused slight nausea, *id.*, and Amoxicillin caused

nausea, *id.*

B.    The ALJ's Decision

        In his RFC analysis, ALJ Rippel summarized Pamela's subjective statements regarding

her symptoms,[5] R. 22, summarized the medical evidence, R. 22–24, and evaluated the opinion

evidence of record, R. 25–26. ALJ Rippel found that Pamela maintained the RFC to perform a

limited range of "light" work. R. 21. Relevant to Pamela's arguments on appeal, ALJ Rippel

determined that Dr. Lee's opinion had "little persuasiveness, as it is inconsistent with and not

supported by the medical evidence of record, including Dr. Lee's own treatment notes." R. 26

(citing R. 742–44, 925–26); *see also* R. 24 (citing R. 304, 308, 324, 582, 584, 587, 590, 743,

926). He found that Dr. Lee's August 2018 examination of Pamela revealed that she was "alert

---

[5] "Symptoms" are the claimant's own description of her medical condition. 20 C.F.R. § 404.1502(i).

and oriented times three, her neck was supple with full range of motion, she displayed normal reflexes, normal muscle tone, normal mood and affect, and normal behavior, and was assessed with vertigo and non-intractable headache." *Id.* (citing R. 925–26). He also found that on Pamela's February 2019 exam, Dr. Lee noted "tenderness throughout the thoracic vertebrae and para-thoracic muscles, with normal reflexes and normal muscle tone, normal mood and affect, and normal behavior, and [Pamela] was assessed with chronic back pain." *Id.* ALJ Rippel explained that these findings indicated Pamela would not be as functionally limited as Dr. Lee found and that they showed she maintained the RFC to perform a limited range of light work. *Id.*; *see also* R. 25–26 (citing the same findings in adopting DDS physician's medical opinion that Pamela could meet the specific strength demands of light work (citing R. 100–01)). He also found her normal body mass index ("BMI") cast doubt on Dr. Lee's purported finding that Pamela was limited in her abilities to stoop and lift "due to obesity." R. 26.

C.    *Analysis*

    Pamela first argues that the ALJ erred by failing to give "considerable weight" to Dr. Lee's opinion as to her functional capabilities. Pl.'s Br. 1–2. For claims filed after March 27, 2017, a "medical opinion" is a statement from a "medical source"[6] about what a claimant can do despite her impairments and whether one or more impairments causes limitations or restrictions in her ability to perform physical, mental, and other work demands and to adapt to environmental conditions in the workplace. 20 C.F.R. § 404.1513(a)(2)(i)–(iv). The ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior

---

[6] A "medical source" is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." 20 C.F.R. § 404.1502(d).

administrative medical finding(s), including those from [a claimant's] medical sources."20
C.F.R. § 404.1520c(a). Instead, the ALJ must adequately explain whether and to what extent
every medical opinion in the record is "persuasive." *See id.* § 404.1520c(b). The regulations
instruct that supportability and consistency are "the most important factors" and thus the ALJ
must address those two factors in evaluating the persuasiveness of an opinion or a finding. *See
id.* § 404.1520c(b)(2), (c)(1)–(2). The ALJ may, but is generally not required to, explain how he
or she considered other factors, including the medical source's specialization and relationship
with the claimant. *Id.* § 404.1520c(c)(3)–(5).

ALJ Rippel satisfied this standard. ALJ Rippel addressed the medical opinions in the
context of analyzing Pamela's RFC. R. 24–26. He began that analysis by discussing Pamela's
subjective reports of symptoms and limitations, R. 22, which he found inconsistent with other
relevant evidence in the record, R. 24. ALJ Rippel found that the imaging results showed mild to
moderate cervical and lumber spine abnormalities and no significant brain abnormalities. R. 24.
He then found that Pamela's treatment had been "routine, conservative, and unremarkable,"
consisting of several prescription medications, a six-week stint of physical therapy, and a nerve
block. R. 24–25. He also found Pamela's statements of her limitations were not consistent with
observations made in treatment notes. R. 25. ALJ Rippel concluded that Pamela's functional
abilities were not as limited as she claimed. *Id.* Pamela does not challenge this analysis on
appeal. *See* Pl.'s Br. 1–3.

As to Dr. Lee's opinion, ALJ Rippel noted the physician indicated that Pamela's "ability
to bend, stoop, stand, sit, lift, walk, run, grip, and pull [were] markedly limited;" she was
"limited from stooping or lifting due to her obesity;" and she could "sit, stand, or walk for less
than an hour." R. 26. In finding that opinion carried "little persuasiveness," ALJ Rippel

explained that it was "inconsistent and not supported by the medical evidence of record, including Dr. Lee's own treatment notes." R. 26. He then noted that Dr. Lee's August 2018 exam findings showed Pamela "was alert and oriented times three, her neck was supple with full range of motion, she displayed normal reflexes, normal muscle tone, normal mood and affect, and normal behavior," and Dr. Lee assessed vertigo and non-intractable headaches at that time. *Id.* He further observed that Dr. Lee's February 2019 exam findings showed Pamela "had tenderness throughout the thoracic vertebrae and para-thoracic muscles, with normal reflexes and normal muscle tone, normal mood and affect, and normal behavior" and Dr. Lee assessed thoracic back pain at that time. *Id.* ALJ Rippel accurately characterized Dr. Lee's treatment notes.[7] *See* R. 304 (noting hand tremor, but normal gait and station, muscle tone, and strength); R. 308 (noting normal gait and muscle tone without tremor); R. 914 (noting normal gait and station and oriented times three). Thus, he could reasonably determine that the largely normal examination findings were inconsistent with Dr. Lee's opinion of extreme limitations. *See* 20 C.F.R. § 404.1520c(b)(2), (c)(1)–(2). Indeed, even Pamela's own description of her limitations is not as extreme as Dr. Lee's limit to lifting fewer than five pounds and sitting, standing, or walking less than one hour each in an eight-hour workday. Considering the other evidence that ALJ Rippel analyzed—imaging, routine and conservative treatment, and other medical providers' mostly normal findings, and the DDS physician's medical opinion—he could reasonably determine that this evidence demonstrated that Pamela maintained the RFC to perform a limited range of "light" work and was inconsistent with Dr. Lee's medical opinion. *See Holland v. Kijakazi*, No. 1:20cv249, 2021 WL 3744563, at *3 (W.D.N.C. Aug. 24, 2021) ("Determinations as to the

---

[7] ALJ Rippel incorrectly stated that Dr. Lee opined Pamela "is limited from stooping or lifting due to her obesity." R. 26. Dr. Lee attributed those limitations to Pamela's pain, R. 945 ("Markedly limited due to pain"), and his opinion does not mention obesity, R. 943–47. Nonetheless, this error is harmless. Excluding the ALJ's erroneous reference to obesity, he still provided adequate grounds for finding "little persuasiveness" for the severe restrictions Dr. Lee assessed.

persuasiveness of . . . medical opinions will not be disturbed absent some indication of specious inconsistencies or lack of proper justification." (citing *Koonce v. Apfel*, 166 F.3d 1209, at *2 (4th Cir. 1999) (table))).

Next, Pamela contends that the ALJ "failed to give appropriate weight to the medications that [Pamela] takes on a daily basis" and her testimony that these medications cause side effects that "would limit her ability to be gainfully employed." *See* Pl.'s Br. 2 (citing R. 55–57). Typically, "an ALJ must consider medication side effects in evaluating the credibility of a claimant's statements about subjective symptoms like pain." *Rowland v. Colvin*, No. 4:13cv7, 2014 WL 2215884, at *15 (W.D. Va. May 29, 2014) (citing 20 C.F.R. § 404.1529(c)(3)(iv)). Nonetheless, "an ALJ's failure to consider medication side effects prejudices the claimant only if the claimant has provided evidence that the side effects caused some limitation in the claimant's RFC." *Id.*; *cf. McAnally v. Astrue*, 241 F. App'x 515, 518 (10th Cir. 2007) ("[W]e agree with the magistrate judge that, "[w]ith regard to [her] hypertension, loss of vision or skin problems, the claimant has shown no error by the ALJ because she does not identify any functional limitations that should have been included in the RFC [assessment] or discuss any evidence that would support the inclusion of any limitation."). Pamela testified that her medications caused drowsiness, nausea, vomiting, increased dizziness, and "bad headaches." R. 55–56. Within the relevant period, however, the medical records show only two references to treatment-related side effects.[8] Dr. Murphy noted, "[p]atient is on multiple medications at this time many of which *can* cause fatigue," R. 913 (emphasis added), and Dr. Visvalingam speculated that her high methadone dosage "*may* be contributing to generalized myoclonus," R. 300 (emphasis added),

---

[8] Prior to the relevant period, Pamela did tell providers that she was experiencing certain side effects from her medications. For instance, in 2015 she said Metformin caused her headaches every morning lasting for one hour, R. 414, and that she did not like the way Chantix and Wellbutrin made her feel, R. 419. Dr. Deputy also speculated that Pamela may be allergic to hydrocodone in 2010 after she reported that it caused rashes. R. 897.

before she decreased the dosage from 40 mg daily to 10 mg daily, R. 306. These treatment notes do not document any actual side effects that Pamela reportedly experienced; rather, they note the possibility that her medications could cause fatigue and that the 40 mg of methadone she was taking on a daily basis in November 2017 may have contributed to her myoclonus. The possibility that the medications "can cause fatigue" does not support the disabling side effects that Pamela's brief attributes to her medications. Indeed, "[d]rowsiness often accompanies the taking of medication, and it should not be viewed as disabling unless the record references serious functional limitations." *Johnson*, 434 F.3d at 658 (quoting *Burns v. Barnhart*, 312 F.3d 113, 131 (3d Cir. 2002)). The ALJ also noted one instance when Pamela was "dozing off" at a physical therapy appointment, R. 25 (citing R. 546), and he contrasted that to the many treatment notes that documented examination findings that she was alert and oriented, *id.*

Moreover, as discussed in greater detail below, the ALJ adequately considered Pamela's myoclonus and alleged epilepsy symptoms. *See* R. 18, 28. Dr. Visvalingam's January 2018 note that Pamela's methadone was thought to contribute to her myoclonus "in the past" suggests that he believed that reducing the dose to 10 mg daily resolved that issue, R. 306, which is supported by the fact that Pamela did not testify to any side effects from methadone, R. 56. Pamela has not identified any other instances in the medical records that document her report or a medical provider's observation of any medication side effects. On the contrary, those records show that Pamela often denied experiencing some or all of the side effects that she described in her hearing testimony, *see, e.g.*, R. 305–06, 580, 583, 586, 925; *see also* R. 944, which supports ALJ Rippel's finding that Pamela "provided inconsistent statements regarding her limitations," R. 25. *See Fluellen v. Colvin*, No. 4:14cv30, 2015 WL 2238997, at *4 (W.D. Va. May 12, 2015) (medical records showing that the claimant often either expressly denied or failed to report

relevant symptoms during office visits created "inconsistencies [that] support[ed] the ALJ's finding that [the claimant's] symptoms and reported functional limitations were not as severe as alleged" (citing *Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014))).

Although the ALJ did not explicitly address Pamela's alleged medication side effects, he did note her prescription medications, *see* R. 24 (noting "[h]er medication included albuterol, ProAir HFA, Lipitor, Baclofen, Gabapentin, Imitrex, Lamictal, Meloxicam, Methadone, Prednisone, and Trazadone."), 25 (noting conservative treatment including medications), and he limited Pamela to light work with postural and environmental restrictions. Pamela has not shown that these restrictions are inadequate to address the fatigue and other side effects that she alleges. *See Glenn v. Berryhill*, No. 2:18cv231, 2019 WL 6089882, at *11 (D.S.C. Apr. 24, 2019) ("There is no evidence in the record that the side effects from Plaintiff's medications requires limitations beyond those assessed by the ALJ in his decision. Accordingly, any failure by the ALJ to expressly mention certain side effects of Plaintiff's medications was harmless error."); *See Deborah B. v. Berryhill*, No. 4:17cv83, 2019 WL 9075878, at *8 (W.D. Va. Feb. 13, 2019) ("This error is harmless, however, because common medication side effects like drowsiness 'should not be viewed as disabling unless the record references serious functional limitations,' and [Plaintiff] 'has failed to point to any specific piece of evidence not considered by the ALJ that might have' compelled this conclusion.'") (internal citations omitted), *adopted*, 2019 WL 4345373 (W.D. Va. Sept. 12, 2019). Accordingly, I cannot find that the ALJ committed reversible error in not further limiting Pamela's RFC to account for her alleged medication side effects.

Lastly, Pamela argues that the ALJ erred by failing to give "appropriate weight" to the records of Sentara RMH Neurology. Pl.'s Br. 2 (citing R. 893–914). According to Pamela, these

records "verify that [she] 'jerked so hard during a seizure the previous night that she fell out of bed,'" and document that she "suffered with" chronic myoclonic epilepsy, convulsive epilepsy, chronic migraines, persistent cervical myelopathy, bilateral occipital neuralgia, supraorbital neuralgia, vertigo, sleep apnea, and restless leg syndrome. *Id.* ("Dr. Glenn Deputy, a neurologist, assessed [her] with medical conditions which Dr. Deputy labeled as 'chronic' and 'persistent.'"). Pamela does not explain what she means by "appropriate weight," nor does she point to any specific findings in those records that ALJ Rippel failed to consider.

In her brief, Pamela specifically cites Dr. Deputy's "[s]ubjective" note in May 2018 that Pamela "had a recent episode where she jerked and fell out of bed," R. 908. Pl.'s Br. 2. Although the ALJ did not mention this comment, *see Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014) ("[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision." ), he did discuss Dr. Deputy's treatment note that Pamela displayed essential tremor, and markedly hyperactive reflexes on exam in a January 2019 neurology evaluation, and that she "was assessed with vitamin B12 deficiency, benign paroxysmal positional vertigo, generalized convulsive epilepsy, chronic migraine, supraorbital neuralgia, bilateral occipital neuralgia, myoclonic epilepsy, and cervicalgia." *See* R. 24 (citing 2R. 893–96). Moreover, contrary to Pamela's argument, the doctor's subjective note does not objectively "verify" that Pamela fell out of bed on one occasion, *cf. Craig v. Chater*, 76 F.3d 585, 590 n.2 (4th Cir. 1996) ("There is nothing objective about a doctor saying, without more, 'I observed my patient telling me she was in pain.'"), much less that she actually "had convulsive episodes several times a week . . . and needed time to recover afterwards," R. 28 (rejecting Pamela's testimony about the intensity, frequency, and functionally limiting effects of her epilepsy). ALJ Rippel also noted Pamela's complaints of facial pain in October and November 2017 and her

diagnosis of trigeminal neuralgia, as well as her reports of paresthesia in her upper extremities and upper legs. R. 22. He found, however, that aside from tremor in her hands and some mild weakness of the right hand, her examination findings were normal. *Id.* Further, he noted that although she showed abnormal reflexes at a January 2018 follow up with her neurologist, she was alert and oriented, and had normal muscle tone, coordination, and gait. *Id.*

ALJ Rippel also considered conflicting evidence. For instance, he observed that her December 2017 brain MRI "showed no significant abnormality of the trigeminal nerves" and that her "comprehensive audiometry evaluation in May 2018 did not reflect tinnitus or vertigo." *Id.* Additionally, he noted her June 2018 brain MRI continued to show "no significant abnormality" and that "[f]indings during physical examinations ha[d] been minimal, with [Pamela] alert and oriented, with normal mood and affect, normal sensation, normal reflexes, normal strength, and normal gait." *Id.* Moreover, he noted her "routine, conservative, and unremarkable" treatment. Thus, ALJ Rippel clearly considered the evidence of these impairments. He then weighed that evidence against conflicting evidence and determined that although Pamela had some limitations, she was not entirely precluded from employment. He "both identif[ied] evidence that supports his conclusion and buil[t] an accurate and logical bridge from that evidence to his conclusion," *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018). As such, I do not find any error in the ALJ's evaluation of the records of Sentara RMH Neurology.

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT** the Commissioner's Motion for Summary Judgment, ECF No. 15, **DENY** Pamela's Motion for Summary Judgment, ECF No. 14, **AFFIRM** the Commissioner's final decision, and **DISMISS** this case from the active docket.

22

**Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to the parties.

ENTER: February 11, 2022

Joel C. Hoppe
U.S. Magistrate Judge